1  
2  ALAN HIMMELFARB- SBN 90480  
   KAMBEREDELSON, LLC  
   2757 Leonis Boulevard  
3  Los Angeles, California 90058  
   t: 323.585.8696  
4  f: 323.585.6195  
   ahimmelfarb@kamberedelson.com  
5  
   ATTORNEY FOR PLAINTIFF  
6  Camellia Walker  

7  

8  ### IN THE UNITED STATES DISTRICT COURT

9  ### FOR THE NORTHERN DISTRICT OF CALIFORNIA

10 ### AT SAN FRANCISCO

11

12 | CAMELLIA WALKER, individually and on behalf of a class of similarly situated | CASE NO. C-08-03648 MHP |
|---|---|

13 individuals,

**PLAINTIFF'S NOTICE AND MOTION TO REMAND; DECLARATION OF RANDALL A. SNYDER IN SUPPORT OF PLAINTIFF'S MOTION TO REMAND**

14          Plaintiff,

15 v.

16 MOTRICITY, INC., a Delaware corporation,

Date: October 6, 2008  
Time: 2:00 p.m.  
Judge: Marilyn Hall Patel  
No Trial Date Set

17          Defendant.

18

19

20

21

22

23

24

25

26

27

28

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT on October 6, 2008, at 2:00 p.m., or as soon thereafter as counsel may be heard before the Honorable Marilyn Hall Patel in Courtroom 15 of the United States District Court for the Northern District of California, located at U.S. Courthouse, 450 Golden Gate Avenue, 18th Floor, San Francisco, California 94102, Plaintiff Camellia Walker will and hereby does move under 28 U.S.C. § 1447(c) for an order remanding this action to the Superior Court of the State of California, County of Alameda, with attorneys' fees and costs awarded to Plaintiff.

Pursuant to the provisions of 28 U.S.C. § 1447(c), Plaintiff moves to have this case remanded to the Superior Court of California, County of Alameda. Defendants' removal of this case to this Court was improper and contrary to well-established law. This Court lacks subject-matter jurisdiction over the case and therefore should remand the case with attorney's fees awarded to Plaintiff.

Defendant shoulders the burden of demonstrating, by a preponderance of the evidence, that removal is proper. As explained in the contemporaneously-filed Memorandum of Points and Authorities in Support of Plaintiff's Motion to Remand, Defendant has failed to sustain that burden. Among other reasons, Defendant has failed to show that the amount in controversy exceeds $5 million as required for removal under CAFA.

WHEREFORE, Plaintiffs respectfully request this Honorable Court remand this action to the Superior Court of California, County of Alameda, award fees to the Plaintiff incurred in bringing this motion, and award such additional relief as this Court deems necessary and just.

DATED: August 27, 2008

**CAMELLIA WALKER**

By:    /s/ Alan Himmelfarb
        One of Ms. Walker's Attorneys

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO REMAND**

In its attempt to show that the amount in controversy in this case exceeds $5 million, Motricity advances a straw man argument that the injunctive relief Plaintiff seeks requires Motricity to develop, or participate in the creation of, an access code system that would cost Motricity $7,985,430. This is not true. In the complaint, Plaintiff generally requests that the Court "[e]nter judgment for injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiff and the Class." (See Compl., Prayer for Relief, p. 15, ¶ h). Nowhere does Plaintiff seek to require Motricity to develop an access code system. Rather, Plaintiff alleges that Motricity need only "agree" to process customer access codes given by the wireless carriers. Motricity ignores the actual language of the allegation and argues instead that such injunctive relief requires it to develop, or participate in the creation of, an access code system. Critically, however, by providing an estimate of the costs of developing such a system—something that Plaintiff is not seeking—Motricity has failed to show that the amount in controversy in this case exceeds $5 million.

Even assuming *arguendo* that Plaintiff is seeking to require Motricity to develop an access code system, Motricity has still failed to show that the amount in controversy exceeds $5 million because Motricity's expert overstates the costs of developing such a system and processing customer access codes, and the access code system is not the only way to cease the phenomenon of illegal billing for unauthorized mobile content. As a result, this Court should remand this case to the Superior Court of California, County of Alameda. In support, the Plaintiff states as follows:

## BACKGROUND FACTS

This case concerns Motricity's alleged profiteering from "cramming"—the process by

1    which providers of premium mobile content collect money from cell-phone customers for

2    services the customers never actually ordered, and then remit a percentage of that money to

3    entities known as aggregators and wireless carriers. (Compl. ¶¶ 6-26). Cell phones and other

4    mobile devices have the capacity to display premium mobile content (ringtones, games, stock

5    tips, jokes, daily horoscopes, etc.) (Compl. ¶ 6). Cell phone users purchase such mobile

6    content services on Internet websites, through short code promotions, and by other means.

7    (Compl. ¶ 13).[1]

8

9         Mobile content providers charge their customers subscription fees that ultimately

10   appear as line-items on the customers' cell phone bills. (Compl. ¶ 12). To effectuate such

11   purchases, providers of mobile content send a customer's telephone number and charge to a

12   billing aggregator, such as Motricity, who has relationships with the wireless carriers.

13   (Compl. ¶ 12). These aggregators act as middle-men, representing numerous mobile content

14   providers in arriving at agreements that allow such content providers to use the billing and

15   collection mechanisms of the wireless carriers. (Compl. ¶¶ 8, 14). Armed with only the

16   wireless phone number and the charge, the billing aggregator can cause a cryptic line-item to

17   be placed on the customer's wireless telephone bill. (Compl. ¶ 12). Mobile phone customers

18   then pay their wireless carriers directly, who keep a portion of the proceeds before remitting

19   the remainder to the aggregator, who, in turn, retains its share before sending the mobile

20

21

22

23

----

24   [1] For example, Customer A visits a website operated by a mobile content provider that sells
ringtones for $1 each. Customer A enters her wireless telephone number into a field on the

25   website, and the desired ringtone is sent to her wireless device. The mobile content provider
then sends Customer A's telephone number and the corresponding charge information to a

26   billing aggregator (a middleman of sorts who has relationships with major wireless carriers

27   such as AT&T, Sprint and T-Mobile). The aggregator, in turn, instructs Customer A's
wireless carrier to place the charge on Customer A's cell phone bill. Critically, no mechanism

28   adequately verifies that the person ordering the services is actually Customer A, or someone
authorized to make such purchases on Customer A's behalf.

1  content provider the remaining proceeds. (Compl. ¶¶ 19, 20).

2       Given the absence of adequate verification procedures, a mobile content charge may

3  be wrongfully placed on a cell phone bill. (Compl. ¶ 12, 13). In each case, the absence of
4
5  adequate verification procedures allows these companies to pocket monies for services

6  customers never actually ordered. (Compl. ¶ 8). Here, the Plaintiff alleges that Motricity

7  caused her to be billed for mobile content services that she never authorized. (Compl. ¶¶ 27-

8  33).

9
       On July 30, 2008, Motricity filed a "Notice of Removal" arguing that this Court
10
11  should exercise jurisdiction over this case under CAFA. Plaintiff concedes that Motricity has

12  shown minimal diversity and that the lawsuit concerns over 100 persons. Motricity has failed

13  to demonstrate by a preponderance of the evidence, however, that the amount in controversy

14  in this case exceeds $5 million. Accordingly, this case should be remanded to the Superior

15  Court of the State of California, County of Alameda.
16
17                              **ARGUMENT**

18       Federal courts are courts of limited jurisdiction. *Lowdermilk v. U.S. Bank, Nat'l*

19  *Ass'n,* 479 F.3d 994, 999 (9th Cir. 2007) (federal jurisdiction is to be strictly construed)

20  (relying on *Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 377, 114 S.Ct. 1673, 128
21
22  L.Ed.2d 391 (1994)). As a result, removal statutes ought to be construed narrowly. *See Gaus*

23  *v. Miles Inc.*, 980 F.2d 564, 566 (9th Cir. 1992) ("Federal jurisdiction must be rejected if there

24  is any doubt as to the right of removal. . . .") (citations omitted); *see also Guglielmino v.*

25  *McKee Foods Corp.*, 506 F.3d 696, 700 (7th Cir. 2007) (the "plaintiff is 'master of her

26  complaint' and can plead to avoid federal jurisdiction.") (*citing Lowdermilk*, 479 F.3d at 998-
27
28  99).

1

### A.    Motricity Bears the Burden of Proving CAFA Jurisdiction

2

CAFA provides, in relevant part, that "the district courts shall have original

3
jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of
4

5
$5,000,000, exclusive of interest and costs," where there are at least 100 members of the

6
putative class, and at least one member of the putative class is a citizen of a state different

7
from the defendant.  28 U.S.C. § 1332(d).

8
The burden of proving jurisdiction rests with the party seeking removal. *Lowdermilk,*
9
*479* F.3d at 997; *see also Abrego Abrego v. The Dow Chemical Co.,* 443 F.3d 676, 685 (9th
10

11
Cir. 2006) (removing party required to prove burden by preponderance of evidence); *McNutt*

12
*v. General Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936) ("If [the removing

13
defendant's] allegations of jurisdictional facts are challenged by his adversary in any

14
appropriate manner, he must support them by competent proof"); *Serrano v. 180 Connect,*
15
*Inc.,* 478 F.3d 1018, 2007 WL 601984 (9th Cir. 2007) (the proponent of federal jurisdiction
16

17
bears the burden of proving jurisdiction).

18
In determining whether the removing party has met its burden, courts may look to the

19
complaint to see "whether it is 'facially apparent' [] that the jurisdictional amount is in

20
controversy;" but if not, "may consider facts in the removal petition, and [] require parties to

21

22
submit summary-judgment-type evidence. . . ." *Singer v. State Farm Mut. Auto. Ins. Co.*, 116

23
F.3d 373, 377 (9th Cir. 1997) (internal citations omitted).  Conclusory allegations are

24
insufficient to support jurisdiction. *Id.*; *Gaus*, 980 F.2d at 567.  Evidence a removing party

25
might use to establish federal jurisdiction includes admissions in state court, calculations

26
based on the complaint's allegations, or introducing affidavits from the defendant's
27

28
employees or experts. *Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536, 541-42 (7th Cir.

1  2006).

2    **B.    Plaintiff is Not Seeking to Require Motricity to Develop, or Participate in the**
3        **Development of, an Access Code System**

4    Motricity shoulders the burden of proving $5 million at issue by a preponderance of

5  the evidence. This it has failed to do.

6    Motricity's evidence of the amount in controversy rests entirely on its straw man
7
8  argument that the injunctive relief Plaintiff seeks requires Motricity to develop, design, or

9  participate in the creation of, an "access code" system (e.g., a system in which mobile content

10  providers would be required to produce a customer's access code—given to a wireless

11  customer when an account is opened—any time the content provider attempts to charge a
12
13  wireless customer's account). As its sole proof, Motricity attaches to its notice of removal the

14  declaration of Paul Bock ("Bock"), Motricity's Director of Engineering. Bock's declaration,

15  however, does not bring Motricity any closer to establishing the amount in controversy. Put

16  simply, Plaintiff is not seeking to compel Motricity to develop an access code system.

17    In her complaint, Plaintiff makes a single reference to an access code system inasmuch
18
19  as she alleges that if Motricity wanted to put an end to the illegal billing of mobile content,

20  Motricity need only *agree* to process an access code given by the wireless carrier to the cell

21  phone customer. (emphasis added). Bock implicitly concedes that the wireless carriers would

22  develop such a system, but nonetheless, uses the passive voice in paragraph three of his

23  declaration to muddy whom the complaint contemplates should develop the system. (Bock
24
25  Decl., ¶ 3, "I have reviewed Paragraph 24 of the Complaint. In order to comply with the

26  relief requested therein, Motricity would be forced to effectuate a system whereby a unique

27  "access code" for each customer would be provided.").

28    The complaint makes clear that in such a system, wireless carriers provide new

1    customers with access codes when a new wireless account is opened. Because it is the

2    wireless carriers that are providing the access codes, it is the wireless carriers that would

3
4    necessarily create the system. Aggregators such as Motricity need only *agree* to process the

5    customer access code before a third party attempts to charge the account for mobile content.

6    Bock's declaration does not address the far more narrow calculation of the costs of agreeing

7    to process these access codes (attorneys' fees, time spent executing an agreement, and the

8    attendant costs of compliance). Hence, by calculating the costs of developing the entire

9
10   system, Bock's declaration misses the point and, more importantly, should not be viewed as

11   evidence of the amount in controversy.

12       *C.*    ***Bock Overestimates Both the Costs of Developing an Access Code System***
         ***and the Costs of Agreeing to Process Customer Access Codes***
13

14       Assuming *arguendo* that Bock's declaration addresses the costs that Motricity stands

15   to incur by agreeing to process customer access codes, such costs would be considerably less

16   than $5 million, let alone the $7,985,430 figure advanced by Motricity. (*See* Declaration of

17   Randall A. Snyder, a true and accurate copy of which is attached as Ex. A).[2]

18       As explained in the declaration of industry expert Randall A. Synder, even if Motricity

19   were to build an access code system from the ground up, it is unlikely that the costs of doing

20   so would exceed $5 million. (Snyder Decl. ¶ 6). The reason being that Bock's cost analysis

21   relies on the flawed assumption that Motricity lacks the necessary software, systems, facilities

22

23

24   _____

25   [2] Mr. Snyder is an independent mobile telecommunications technology consultant with 24
     years of experience and is an expert in the field of mobile and cellular telecommunications.
26   He spent seven years developing standards within the American National Standards Institute's
     (ANSI) subsidiary organization, the Telecommunications Industry Association (TIA),
27   providing technical contributions and authoring and editing mobile telecommunications
     proposed standards documents. Most notably, Mr. Snyder co-founded m-Qube, Inc., a
28   leading billing and processing company, or "aggregator," in the mobile content industry.
     (Snyder Decl. ¶¶ 1-4)

1   and personnel that would be useful in creating such a system.

2       It is disingenuous, however, for Motricity to claim that it must develop from scratch a

3   system to process customer access codes because its existing systems and software have the
4
5   capability to process access codes. (Snyder Decl. ¶ 6). In fact, Motricity currently markets

6   and sells a variety of software products on their managed software platform that already

7   support many of the components (i.e., SMS, SMPP, WAP, HTTP) in Mr. Bock's line-item

8   cost analysis. (Synder Decl. ¶ 6). Hence, the operational and maintenance costs advanced by
9
    Bock are considerably overstated because they do not account for the resources that already
10
11  exist to support Motricity's products. (Synder Decl. ¶ 6).

12      In addition, "Bock provides no detailed description, requirements, functional

13  specifications or detailed design solution that is necessary to produce a complete, competent

14  and well thought out costs analysis of a such a solution..." (Synder Decl. ¶ 5). Nor does
15
    Bock make any effort to compare in-house development costs with the costs of purchasing
16
17  licensable software or solutions that perform some or all of the desired functionality. (Snyder

18  Decl. ¶ 8). Absent such information, Bock's declaration does not contain a realistic

19  assessment of the costs of developing an access code system or processing access codes.

20  Motricity has failed to sustain its burden of proof.[3]

21
        **D.      There Are Other Ways to Stop the Illegal Billing of Mobile Content**
22
23      A cursory review of the complaint reveals that Walker references the access code

24  system as only one example of how to curb the phenomenon of illegal billing for mobile

25  content. The access code system is by no means the only way to stop cramming.

26      Another way that Motricity can put an end to cramming is to follow, or demand that its
27

28  [3] To the extent that the Court finds it necessary, Plaintiff requests leave to conduct limited discovery on this issue.

1  content providers follow, the Consumer Best Practices ("CBP") guidelines promulgated by

2  the Mobile Marketing Association ("MMA"), to which Motricity is a member company.

3
4  (Snyder Decl. ¶ 10). The CBP guidelines provide guidance to content providers, aggregators,

5  and wireless carriers on effective ways to avoid billing for unauthorized mobile content. For

6  example, with respect to offers of "free" mobile content, the CBP guidelines provide:

7      If there are obligations associated with the term 'free', the full commercial offer
       should be disclosed in the same manner at point of offer as the 'free' promotion.
8      The entire offer must be presented in the same place (i.e. banner ad, top of ad,
       etc.). It is important that if the word FREE is used in promoting the service that
9      it be accompanied by WITH SUBSCRIPTION for premium subscription
10     content, or FREE with transport charges. Free should never be promoted alone
       and should always have an indication or means of transport.
11

12 *See* http://www.mmaglobal.com/bestpractices.pdf. It is hard to imagine how Motricity would

13 spend in excess of $5 million by requiring that its content providers adhere to guidelines such

14 as these.

15
       Motricity could also engage the services of a third party such as Bango, Inc.
16

17 ("Bango"), to protect against billing for unauthorized mobile content. (Synder Decl. ¶ 9).

18 Bango administers the actual sale of the mobile content before redirecting the user to the

19 content provider for transmission of the mobile content.[4] This method of billing employs

20 many of the safeguards that accompany Internet credit card purchases at a fraction of the costs

21 of creating an access code system. (Snyder Decl. ¶ 9).
22

23     **E.     *Motricity's One Sentence Assertion of Monetary Damages Is Not Evidence of
                the Amount in Controversy***
24
       Lastly, Motricity tersly asserts that "the additional consideration of monetary damages
25

26 sought by the plaintiff class significantly increases the total amount in controversy—an

27
_____
28
[4] *See http://bango.com/tour/pay/easy.aspx.*

1  amount which far exceeds $8 million…" (Notice of Removal, ¶ 14).  However, to sustain its

2  burden of proof, Motricity must do more than provide conclusory allegations of the amount in

3  controversy.  *See Singer*, 116 F.3d at 377; *Gaus*, 980 F.2d at 567.

4

### CONCLUSION

5

6  Motricity is simply unable to twist the allegations of the complaint sufficiently to

7  show in excess of $5 million in controversy.  Walker is not seeking to require Motricity to

8  develop an access code system and therefore, Motricity's estimate of the costs of developing

9  such a system is not evidence of the amount in controversy.  In the end, Motricity has failed to

10  sustain its burden of proof.

11

12  **WHEREFORE**, Plaintiff Camellia Walker, respectfully requests this Honorable Court

13  (a) grant her motion to remand, (b) remand this case to the Superior Court of the State of

14  California, County of Alameda, or, in the alternative, reserve its ruling on Plaintiff's motion

15  to remand and grant Plaintiff leave to conduct limited discovery into the actual cost of

16  complying with the requested injunctive relief, (c) award Plaintiff attorneys' fees and costs

17  incurred in connection with bringing this motion, and (d) grant such other and further relief as

18  this Court deems equitable and just.

19

20

21  **CAMELLIA WALKER**

22  By: /s/ Alan Himmelfarb
       One of Ms. Walker's Attorneys

23  ALAN HIMMELFARB- SBN 90480
    KAMBEREDELSON, LLC
    2757 Leonis Boulevard
24  Los Angeles, California 90058
    t: 323.585.8696
25  f: 323.585.6195
    ahimmelfarb@kamberedelson.com
26

27

28

1

## CERTIFICATE OF SERVICE

2

   I, Alan Himmelfarb, an attorney, certify that on August 27, 2008, I served the above

3
and foregoing *Plaintiff's Notice and Motion to Remand and the Declaration of Randall A.*
*Snyder in Support of Plaintiff's Motion to Remand*, by causing true and accurate copies of

4
such paper to be filed and transmitted to the persons shown below via the Court's CM/ECF
electronic filing system, on this the 27th day of August, 2008.

5

6
Betty M. Shumener
Henry H. Oh

7
DLA Piper US LLP
550 South Hope Street, Suite 2300

8
Los Angeles, California 90071-2678
Betty.shumener@dlapiper.com

9
Henry.oh@dlapiper.com

10

11

12
_____    /s/  Alan Himmelfarb    _____

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

ALAN HIMMELFARB
KAMBEREDELSON, LLC
2757 Leonis Boulevard
Vernon, California 90058
Telephone: (323) 585-8696

Attorney for Plaintiff
Camellia Walker

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## AT SAN FRANCISCO

|  |  |
|---|---|
| CAMELLIA WALKER, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MOTRICITY, INC., a Delaware corporation,<br><br>Defendant. | Case No.  C 08-03648 MHP<br><br>**DECLARATION OF RANDALL A. SNYDER** |

## DECLARATION OF RANDALL A. SNYDER

I, Randall A. Snyder, hereby declare as follows:

1.  My name is Randall A. Snyder. I am an independent mobile telecommunications technology consultant and reside at 8113 Bay Pines Avenue, Las Vegas, Nevada, 89128. I have been retained by the law firm of KamberEdelson, LLC to provide my opinions on issues concerning mobile short message service (SMS) technology, commonly known as mobile text messaging, mobile content distribution technology and the use of these technologies by Motricity, Inc.

DECLARATION OF RANDALL A. SNYDER

2.  I have over 24 years of experience in mobile telecommunications network and system architecture, engineering, design and technology. I consider myself to be an expert in the field of mobile and cellular telecommunications, mobile and cellular networking technology and specifically, short message service and mobile content distribution technologies. A copy of my *curriculum vitae* is attached to this declaration.

3.  I have taught many classes and seminars on mobile telecommunication network technologies and have been a panelist and speaker at numerous conferences at the Institute of Electrical and Electronics Engineers (IEEE), the Personal Communication Society (PCS), and the Cellular Telecommunications and Internet Association (CTIA) as an expert in mobile telecommunication networks. I spent seven years developing standards within the American National Standards Institute's subsidiary organization, the Telecommunications Industry Association (TIA), providing technical contributions and authoring and editing mobile telecommunications proposed standards documents. Most notably, I authored and oversaw the standardization of Interim Standard 93, providing interconnection technology between wireline and mobile networks, which is now a fully accredited national standard of the American National Standards Institute (ANSI). I am the author of the McGraw-Hill books "Mobile Telecommunications Networking with IS-41," and "Wireless Telecommunications Networking with ANSI-41, 2nd edition" published in 1997 and 2001, respectively. These books have sold several thousand copies and were required reading for mobile engineers at AT&T Wireless and Motorola for several years. The latter book has also been relied upon and cited numerous times as a reference for various Short Message Service (SMS) patents in the mobile industry, such as Method and Apparatus for Routing Short Messages, US Patent #6308075, Method and System for Wireless Instant Messaging, US Patent # 7058036 and Automatic In-Line Messaging System, US Patent # 6718178. I have been granted several patents myself

-2-

1    on mobile networking technology and currently have three additional patent

2    applications filed in the area of Short Message Services and mobile content

3    publication and delivery. I have also authored several articles on mobile

4    telecommunications technology and have been quoted numerous times in industry

5    trade publications. I have consulted and been employed for many mobile

6    telecommunications companies including McCaw Cellular, AirTouch, AT&T

7    Wireless, Lucent, Nokia, Ericsson, Nextwave, MCI, Sprint and other mobile

8    technology vendors and service providers. I was a founder of m-Qube, Inc. (acquired

9    by Verisign, Inc. in 2006), which develops and markets mobile text messaging

10   services. I was also nominated in 2006 for a National Television Arts Emmy Award

11   for Outstanding Achievement in Advanced Media Technology for unique mobile

12   content distribution products I designed while employed at Entriq, Inc. Still more

13   detail as well as details of publications that I have authored or co-authored within at

14   least the past 10 years are provided in my attached *curriculum vitae*.

15   4.  I have reviewed the original complaint against Motricity, Inc. and the Declaration of

16   Mr. Paul Bock, Director of Engineering for Motricity, Inc. It is my understanding that

17   Mr. Bock has provided a cost analysis for the development, operation and ongoing

18   maintenance costs for a so-called "access code" solution to prevent Motricity's

19   wrongful and unauthorized billing of mobile subscribers.

20   5.  Mr. Bock has provided a detailed line item cost analysis to implement and deploy an

21   access code solution on behalf of Motricity's content provider customers whereby

22   wrongful and unauthorized charges to mobile subscribers may be prevented. The

23   costs provided are based on a set of individual assumptions that, if changed, would

24   significantly reduce these costs. And, in fact, Mr. Bock provides no detailed

25   description, requirements, functional specifications or detailed design of the solution

26

27

-3-

28   DECLARATION OF RANDALL A. SNYDER

1

2

that is necessary to produce a complete, competent and well thought out cost analysis of such a solution leading to his conclusion of a total cost just under $8 million.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

6. Chief among the cost analysis assumptions is that an access code solution needs to be completely implemented and deployed from scratch. The primary characteristic of this assumption is that there exists no software, systems, facilities or personnel at the start of the project. Moreover, the assumption is made that such a solution cannot be integrated into Motricity's existing systems or software and that any existing systems or software that Motricity owns cannot be used for the solution. Motricity, Inc. currently markets and sells a variety of software products on their managed software platform supporting many of the components in Mr. Bock's line-item cost analysis.[1] For example the Motricity Gateway and Motricity Messaging products provide the technology to completely support SMS, Premium SMS, SMPP, WAP, HTTP, billing processing and mobile content storefronts.[2]  Furthermore, the cost analysis highlights the operational and maintenance costs for the development and maintenance of an access code solution for which these resources must already exist to support the Motricity Gateway, Messaging and other products. In addition, Motricity's existing products make extensive use of database technology and resources that also must already exist and can be used to mitigate costs.

19

20

21

22

7. Another assumption that is explicitly put forth by Mr. Bock is that the entire project to create, manage and support an access code solution requires additional expensive consultants under contract to implement and develop the solution. These contractors include product managers, architects, software programmers, database administrators,

23

24

25

26

27

28

[1] See http://www.motricity.com/about/keyserve.php.

[2] See http://www.motricity.com/pdf/services/gateway.pdf.; http://www.motricity.com/pdf/services/messaging.pdf.

-4-

DECLARATION OF RANDALL A. SNYDER

1    project managers and operations personnel at a cost of $125 per hour. The cost of

2    contractors can vary widely and in my experience these skill sets can be obtained for

3    significantly less, especially when obtained through a competitive bidding process or

4    bundled under a single umbrella contract for the entire project. Also, the number of

5    person-hours required for this personnel for each cost item put forth is highly

6    questionable since without detailed solution descriptions, requirements specifications,

7    functional specifications and design specifications it is not possible to estimate how

8    much labor is required for a particular aspect of a particular software development

9    project.

10    8.    If we make the assumption that even in the presence of existing technology, Motricity

11    is forced to implement and deploy an access code solution entirely and completely

12    from scratch, there are many ways to mitigate costs. When confronted with a new

13    software development project, it is typical for software organizations to perform a

14    cost analysis comparing the cost to develop the entire project in-house, using

15    employees or contractors, with the cost of purchasing licensable software or solutions

16    that perform some or all of the desired functionality. This is commonly known as a

17    "buy vs. build" analysis and software organizations that do not perform this analysis

18    would be considered careless. This is because companies that market and sell licensed

19    software solutions can only be profitable if the cost of a particular software solution

20    to their customers is significantly less than the cost for those customers to develop a

21    similar solution themselves.

22    9.    There are many companies that market and sell the components highlighted in Mr.

23    Bock's cost analysis. And, in fact, there are many companies that sell complete

24    solutions for all of the components listed by Mr. Bock obviating the need for most in-

25    house development. Complete licensable solutions for the functionality described by

26    Mr. Bock including SMS, Premium SMS, SMPP, WAP, HTTP, billing processing

27

28    DECLARATION OF RANDALL A. SNYDER

-5-

1    and mobile content storefronts are available from companies such as Bango, Volantis,

2    Verisign and mBlox. These partner and vendor solutions cost significantly less than

3    comparable in-house development and some vendors can even provide the entire

4    solution for a fraction of the cost of developing and maintaining them in-house. In

5    many cases, much of the fees for these solutions may even be charged by the vendors

6    on a transaction basis eliminating much of the initial non-recurring engineering costs

7    and capital expenditures.

8    10. The implementation and deployment of access code functionality can be a feasible

9    means for preventing wrongful and unauthorized billing of mobile subscribers.

10   However, there are other solutions that may be considered. For example, the Mobile

11   Marketing Association (MMA), an industry trade organization that promulgates best

12   practices and codes of conduct for the delivery of mobile content requires that

13   "subscribers must positively acknowledge the acceptance of a premium charge before

14   premium charges are applied to their account."[3]  In fact, Motricity, Inc. is a member

15   of the MMA and played a prominent role in the development of the MMA's Global

16   Code of Conduct that applies to organizations within the mobile content ecosystem.[4]

17   11. There are many ways to implement the MMA's requirements, the most common of

18   which is requiring subscribers to explicitly confirm reception of mobile content

19   charges before the content is delivered using a text message dialogue. This

20   mechanism is known as "double opt-in" and the functionality is provided by many

21   mobile content delivery companies as well. The double opt-in mechanism is a means

22   to ensure that the subscriber who actually ordered and intended to purchase the

23   content is in fact still the rightful subscriber that desires that content. The double opt-

24

25   [3] See MMA Consumer Best Practices Guidelines Version 3.3, July 9, 2008. ©Mobile
26   Marketing Association, 1670 Broadway, Suite 850, Denver, CO 80202.

27   [4] See http://mmaglobal.com/modules/article/view.article.php/2029.

-6-

28   DECLARATION OF RANDALL A. SNYDER

1

2

3

4

5

6

7

8

in confirmation mechanism is specifically designed to prevent unauthorized billing to subscribers when for some reason it may be discovered that they no longer desire the content or the subscriber is different than the one who originally ordered the content. It is critical to note that, in certain circumstances, for example, content delivered as a recurring subscription service, that a double opt-in confirmation mechanism be provided each time before chargeable content is delivered to ensure that over time the subscriber who originally ordered the content is still the same subscriber and still wishes to pay for the content.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

12. In summary, it is my opinion that a competent cost analysis cannot be performed on an access code solution to prevent wrongful and unauthorized charges to mobile subscribers in the absence of a detailed description, requirements specifications, functional specifications and detailed designs of the solution. It is also my opinion that Motricity has failed to provide a competent cost analysis since no detailed solution description has been provided for the cost analysis nor have detailed requirement specifications, functional specifications and design specifications been used to perform the cost analysis. Motricity, Inc. actively markets and sells solutions that incorporate many of the components and software functions that seem to be required for an access code solution according to Mr. Bock, thereby obviating the need for them to be developed from scratch. The costs provided for expensive consultants may not be required to implement and develop an access code solution if a competitive bidding process is used or licensed software solutions are employed. And finally, an access code solution may not be required as the true requirement to prevent wrongful and unauthorized mobile content charges is to ensure that the mobile subscriber to be charged has explicitly confirmed an instance of mobile content delivery prior to the charges being applied to the account.

26

27

28

-7-

13. My opinions in this declaration are based upon extensive experience in the wireless industry, a detailed understanding of mobile content delivery systems, how premium text messaging services operate and a detailed and thorough understanding of the mobile content delivery ecosystem. If called to testify, I could and would testify competently about these opinions.

Pursuant to 28 USC § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: August 27, 2008

*Randall A. Snyder*

Randall A. Snyder

-8-

DECLARATION OF RANDALL A. SNYDER

1

2

3

4

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**AT SAN FRANCISCO**

5
6
7

CAMELLIA WALKER, individually and on behalf of a class of similarly situated individuals,

      Plaintiff,

8

v.

9
10

MOTRICITY, INC., a Delaware corporation,

      Defendant.

CASE NO. C-08-03648 MHP

**[PROPOSED] ORDER**

11

12

**[PROPOSED] ORDER**

13

14

15

   This cause coming before the Court for ruling on Plaintiff Camellia Walker's Motion to Remand this Case to the Superior Court of the State of California, County of Alameda, pursuant to 28 U.S.C. § 1447(c), due notice having been given, and the Court having been duly advised in the premises,

16

**IT IS HEREBY ORDERED:**

17

18

   1.  Plaintiff's Motion to Remand this Case to the Superior Court of the State of California, County of Alameda, is hereby granted;

19

20

   2.  This case is remanded to the Superior Court of the State of California, County of Alameda;

21

   3.  Plaintiff is awarded attorneys' fees and costs incurred in connection with her Motion to Remand.

22

23

           **ENTERED:**

24

25

           Dated:_____, 2008

26

27

           _____

           Judge Marilyn Hall Patel

28